

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00023-CR

Casey Lane **DAWSON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 198th Judicial District Court, Bandera County, Texas
Trial Court No. CR-16-0000128
Honorable M. Rex Emerson, Judge Presiding

Opinion by:    Patricia O. Alvarez, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Marialyn Barnard, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: December 19, 2018

AFFIRMED

Appellant Casey Lane Dawson was found guilty by a Bandera County jury of aggravated assault by threat and deadly conduct. The trial court subsequently sentenced Dawson to seven years' confinement in the Institutional Division of the Texas Department of Criminal Justice on each count, to be run concurrently, and a fine of $5,000.00. On appeal, Dawson contends the trial court erred in excluding the expert testimony of Greg Ferris and Rebecca Gring and denying his motion for new trial. Additionally, Dawson contends the evidence is insufficient to support the jury's conviction of deadly conduct. We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Gerald Zumm

Gerald Zumm testified that he and his wife moved to Bandera County in 2012 and live on a private ranch road off Highway 173; approximately six other people also lived on the rural roadway. Zumm testified that everyone living off the private road is relatively friendly; Zumm even bought his property from his fence-neighbor. Zumm identified Dawson and testified that Dawson moved into the area approximately a year and a half prior to the incident. Zumm further testified that he and Dawson had little contact prior to the incident, and never any type of argument or anything volatile.

Zumm testified that the first week of June 2016, about a week before the incident, he and his wife were walking to their neighbor's house when they saw Dawson and his wife leaving. There had been some discussion about fixing a fence to keep Dawson's dogs out and Zumm testified, "I just off the cuff said, 'Geez, Casey, why don't you fix your fence?'" Zumm explained that was the extent of the conversation. Zumm really did not think much more about the conversation.

On June 9, 2016, Zumm left his residence around 8:00 a.m. for his morning run. He was listening to a program on his iPhone through his earbuds; Zumm completed half of his run and was headed back to his residence when he heard Dawson come around a curve of the road on "some kind of machine." Zumm testified that he "stopped to say hi, because [Zumm] thought [Dawson] was on a friendly journey." Zumm leaned on Dawson's machine and said, "Hey, Casey, how are you doing?" Dawson responded, "I decided to fix my broken-down fence."

> Then [Dawson] reaches over to his right side and uncovered a weapon, and he lifted the weapon up and he looked at me and he said, "Right after they put you in the ground," and he aimed [the weapon] right at my heart.

Zumm further explained that Dawson moved the firearm to Zumm's right side and "fired it off three or four times." Zumm described the sound as so loud that it shut down his hearing aids. Zumm described himself as frozen and not knowing what to do. Zumm did not want to aggravate the situation. Then Dawson went to Zumm's left side and fired three or four more shots into the ground—"[j]ust to make sure that he got his point across." Zumm testified that Dawson calmly sat down, placed the firearm on the seat next to him, started his machine, and drove down to the other end of the road.

Once Zumm could finally move, he started running toward his residence; he was running as fast as he could when he saw Dawson coming back around the curve. Zumm testified there was nowhere to hide, he was trying to get to a gate, but he simply could not run fast enough. Dawson swerved the machine and came within approximately six-inches of hitting Zumm. Dawson finally left, and Zumm ran to his residence. Zumm testified that when he arrived home, he could not even speak.

**B.     Anne Zumm**

Zumm's wife, Anne, testified that Zumm was very shaken and upset when he arrived at their residence. Zumm was pacing and would not talk for several minutes. After Zumm finally told Anne what happened, they called the sheriff's office and Bandera County Sheriff's Office Investigator Daniel Sanchez, along with several other officers, was dispatched to the Zumm residence. Anne further testified that she and Zumm were still traumatized by the incident and continued to fear for their lives.

**C.     Bandera County Sheriff's Office Investigator Daniel Sanchez**

Investigator Sanchez testified that he met with Zumm at Zumm's residence and was advised of the incident. Investigator Sanchez then drove Zumm back to the embankment where Zumm reported the shots were fired. While Zumm was showing Investigator Sanchez where he

was standing, and from where Dawson was shooting, other deputies were looking for additional evidence. The officers found five spent shell casings; Investigator Sanchez testified the shell casings indicated someone shot a weapon at that location. Investigator Sanchez described Zumm as very emotional and afraid for himself and his wife.

Investigator Sanchez also testified that Bandera County Sheriff's Office Corporal Vela interviewed Dawson about the incident. Dawson's entire statement to the officer was as follows:

> While looking for a missing dog, I encountered a rattler and fired at it. One of my neighbors was on the road at the time. He was near my UTV [utility terrain vehicle] when this occurred.

## D.     Casey Dawson

During the defense's case-in-chief, Dawson testified that he had three dogs, Great Pyreneeses, and he had approximately twenty goats on his ranch at the time of the incident. Dawson testified he did not know if snakes actively seek out goats for food, but he believed he had lost livestock to snakes and he knew he had lost goats to snakes.

Dawson further testified that contrary to Zumm's testimony, his initial contact with Zumm—in front of the neighbor's house—was not in a joking manner; instead, the conversation was rather angry and uncomfortable. On the morning of the incident, Dawson realized one of his dogs was missing. After searching the property, he took his utility vehicle down the road looking for his dog. Dawson further testified that he "always carries his pistol" because of his experience with snakes and feral hogs. Dawson said he saw Zumm, who again asked him about his fences, and Dawson replied, "Gerry, I don't want to hear it."

Dawson acknowledged that when Zumm asked why Dawson was shooting his pistol, Dawson responded, "I'm looking for one of my dogs." Dawson conceded that he did not tell Zumm that he was shooting at a snake, that he had just shot a snake, or even mention a snake. Dawson testified Zumm never referenced the shooting when he asked Dawson "[w]hat are you

doing?" after the shots were fired. But Dawson described Zumm's reaction as "a mixture of [anger and fear]." During cross-examination Dawson acknowledged that at the time of the incident, he was in possession of a firearm and that he discharged the firearm. Dawson never alleged he accidentally discharged the firearm; Dawson maintained he was firing at a snake and not at Zumm. Dawson further agreed that seven shots were fired. Dawson also acknowledged after the shots were fired, he drove down the road, turned around, and drove back towards Zumm.

On November 30, 2017, the jury found Dawson guilty of aggravated assault with a deadly weapon and deadly conduct with a weapon. The trial court subsequently sentenced Dawson to seven years' confinement in the Institutional Division of the Texas Department of Criminal Justice and a $5,000.00 fine.

We turn first to Dawson's issues related to expert testimony.

EXPERT TESTIMONY

A.      Standard of Review

A trial court's determination of a witness's qualifications as an expert and its decision to exclude expert testimony are reviewed for an abuse of discretion. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). The trial court is the sole judge of the weight and credibility of the evidence presented at the suppression hearing. *See Winston v. State*, 78 S.W.3d 522, 525 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (citing *Weatherred*, 15 S.W.3d at 542). If the trial court's ruling lies within the zone of reasonable disagreement, the trial court's ruling will be upheld. *Weatherred*, 15 S.W.3d at 542; *see also Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh'g) (considering whether the trial court acted without reference to guiding rules or principles or whether the trial court acted arbitrarily or unreasonably in so ruling).

Texas Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

witness qualified as an expert by knowledge, skill, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. The proponent of expert testimony must show by clear and convincing proof that the evidence he seeks to introduce is sufficiently (1) relevant and (2) reliable to assist the trier of fact in accurately understanding other evidence or in determining a fact at issue. *Weatherred*, 15 S.W.3d at 542.

The relevant question is whether the scientific principles "will assist the trier of fact" and are "sufficiently tied" to the pertinent facts of the case. *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996). The expert must make an effort to tie pertinent facts of the case to the scientific principles that are the subject of his testimony. *Id*.

**B.      Texas Rule of Evidence 702**

*1.        Testimony of Expert Greg Ferris*

a.        <u>Arguments of the Parties</u>

Dawson contends the trial court erred in excluding expert Greg Ferris's testimony on firearms because his testimony would have affirmatively shown that the location of the shell casings, as found by the Sheriff's office, did not match Zumm's testimony. The State counters the trial court's determination that Ferris's testimony was likely to lead to confusion of the issues and that the probative value of the evidence outweighed its prejudicial effect was not an abuse of discretion.

b.        <u>Testimony Offered Outside the Presence of the Jury</u>

Ferris testified that he was an expert via law enforcement classes and classes through the Texas Department of Public Safety in the area of firearms generally and specifically with regard to bullet trajectories and that he had worked on cases requiring him to determine trajectory. He is not, however, forensically trained or a forensic firearms examiner. Additionally, this was his first case with penetration of bullets into the ground.

Ferris testified that he visited the site of the incident. The following exchange occurred between defense counsel and Ferris:

> Ferris:  There is a—there is quite a few different factors that play into case ejection. Number one is the actual load. In other words, how much dwell time the bullet spends in the barrel to produce the back pressure, which causes it to go against the recoil spring, which moves the weight or the inertia of the slide to the rear and how vigorousness, whether or not the ejector is standard or extended ejector, whether or not the port interferes with the cases that eject. There is a lot of different things that come into play that as a gunsmith you have to recognize.

> Defense Counsel:  And then would you be able to testify—have the expertise to testify on where, you know, case ejection might be in the body of a vehicle if I showed you a photo of a particular vehicle? And, I mean, you were here when, you know, Mr. Dawson was describing where his hand was and so forth. Would you be able to describe, you know, your opinion, then, where those cases would be ejecting or would probably be ejecting?

> Ferris:  I would have an opinion. It would be not precise because of the various different factors that could possibly be involved, because I haven't actually determined at this point that I have heard the entire story or that I ever will, but I can set certain parameters, which will show, at least in my opinion, that a certain action occurred or didn't occur at a particular point. . . . Had I done the testing based on the number of theories that have been exposed here, I could have given you something definitive. As of right now, I only have certain generalities that I could actually testify to.

Defense counsel then asked if Ferris were to view a video where an individual said they were standing, and where the gun was held in a particular location, would Ferris be able to give an opinion to help the jury understand the general area where the casings would have ejected or not ejected? Ferris explained,

> I could offer opinions as to each of the theories based on what evidence has been presented so far as to where the cases actually ended up, and I do have an opinion on that, but to be specific I would have to know certain things, which at this point aren't 100 percent, that I would actually be, like I said, having to assess this at each different theory level with the different conditions that would have applied.

During cross-examination, Ferris further explained that if he "knew the elevation of the cart and the gun relative to the surrounding territory with the actual angle of the firearm," he would be able to give a firm opinion whether the bullet would have ricocheted or embedded in a specific area.

###### c. Trial Court Ruling

The State renewed its objection to Ferris's testimony as speculative. Based on Ferris's own testimony, the State argued that Ferris did not have the necessary information he needed to provide the opinion the defense was requesting. The defense counsel was only now requesting to perform a re-enactment for Ferris, that may or may not provide the information Ferris needed to reach an opinion. Although the State did not contest Ferris's qualifications as an expert, the testimony he was offering was speculative and would simply confuse the issues.

The trial court overruled the State's objection as to Ferris testifying in the general area of firearms, the construction of firearms, the firing of firearms, and any testing Ferris conducted as far as the penetration into the soil. The trial court, however, sustained the State's objection as to any testimony related to ejection explaining "[t]here are too many unknowns, and frankly, it's more likely in the [Texas Rule of Evidence] 403 to confuse the jury than to clarify anything." The trial court continued, "We are not going to play a re-enactment in the courtroom where we don't have seat heights, angles and everything else, which is all the things he testified he needs to have."

###### d. Analysis

Ferris was the last witness the defense proposed to call. The jury previously heard testimony from Zumm and Dawson. The jury heard competing stories regarding where the firearm was located and from where it was fired. The jury heard from officers approximating where the shells were found, but no one pinpointed exactly where each shell casing was located. Although Dawson may have provided a firearm to Ferris, no firearm was ever provided to law enforcement;

thus, any suggestion the firearm was the same firearm used on the day in question would be further speculation by Ferris.

By his own admission, Ferris could not testify as to the embankment or where the shells would have hit the embankment. He could not speak to where the shell casings were found or from what height or angle they were fired. Based on a review of the record, we cannot conclude the trial court's decision to exclude Ferris's testimony *related to ejection* was outside the zone of reasonable disagreement or an abuse of discretion. *See Weatherred*, 15 S.W.3d at 542. Additionally, because we further conclude the exclusion was neither a complete exclusion, nor improper, the exclusion of Ferris's testimony did not deny Dawson "a meaningful opportunity to present a complete defense" or violate his fundamental rights to a fair trial. *Contra Holmes v. State*, 323 S.W.3d 163, 173 (Tex. Crim. App. 2009). Dawson's first and second appellate issues are overruled.

### 2. Rebecca Gring

#### a. Arguments of the Parties

In his fourth issue, Dawson contends the trial court erred in excluding the testimony of Rebecca Gring as an expert on "raising goats and maintaining a goat farm." The State counters that nothing in Gring's testimony would have assisted the jury to determine the likelihood that Dawson shot at a snake any more likely than without her testimony.

#### b. Testimony Offered Outside the Presence of the Jury

Rebecca Gring testified she had been raising milk and meat goats for approximately thirty-two years in the Texas Hill Country. During that time, she has encountered snakes *in the vicinity of her farm* and killed five snakes *on her property*.

Defense counsel offered Gring for the following:

[S]trictly to talk about raising goats in the Hill Country and problems with snakes. . . . Her testimony is limited to the danger of rattlesnakes to someone who is raising goats where the jury can infer—you know, so they can understand where Mr. Dawson was coming from. He is not out there just helter skelter hunting snakes.

The State objected to the testimony arguing that Gring's testimony was irrelevant. The incident did not take place on a goating farm; it took place on a road and Dawson testified that he was looking for his dog. Gring's "testimony as an expert would in no way equip this jury to better understand a difficult issue in this case that would require expert testimony . . . [and a]ny portion of this would confuse a jury."

### C. Analysis

The trial court sustained the State's objection holding that although Gring may be knowledgeable about goats, the record did not contain any evidence any part of the incident or part of the incident occurred on a goat farm. The trial court further opined "frankly, I think any lay person in the Hill Country would shoot a snake on the side of the road, so . . . at this time I'm going to sustain the objection."

Based on a review of the record, the trial court's ruling considered the evidence presented and the theories upon which both the State and defense questioned witnesses. *See Montgomery*, 810 S.W.2d at 380. Gring and defense counsel conceded her testimony was limited to snakes on a goat farm and not snakes on a roadway. *Contra Weatherred*, 15 S.W.3d at 542; TEX. R. EVID. 702. The only shots fired in this case were on a roadway. There was no testimony Dawson was in pursuit of a goat or trying to protect a goat. Moreover, although Dawson testified he was looking for his dog, he did not testify he shot the snake out of fear for his dog. Based on the testimony presented, we cannot conclude the trial court determination to exclude Gring's testimony was outside the zone of reasonable disagreement or an abuse of discretion. *See Weatherred*, 15 S.W.3d at 542. Dawson's fourth issue is overruled.

### C.    Motion for New Trial

"An appellate court reviews a trial court's ruling on a . . . motion for new trial using an abuse-of-discretion standard of review." *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). This standard requires that "[w]e review the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Id*. (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). "We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable." *Id*.

Dawson's motion for new trial was based on the trial court's exclusion of Expert Greg Ferris's testimony on the ejection of the bullet and the location of the shell casings. The arguments were the same arguments raised in appellate issues one and two. For the same reasons we conclude the trial court did not abuse its discretion in our analysis in appellate issues one and two, *see Weatherred*, 15 S.W.3d at 542, the trial court did not abuse its discretion in failing to grant Dawson's motion for new trial, *see Webb*, 232 S.W.3d at 112. Accordingly, we overrule Dawson's third appellate issue.

We next turn to Dawson's sufficiency of the evidence issue.

**SUFFICIENCY OF THE EVIDENCE**

### A.    Standard of Review

In reviewing the sufficiency of the evidence, "we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011); *accord Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). "This standard recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence. . . ." *Adames*, 353 S.W.3d at 860; *accord Gear*, 340 S.W.3d at 746. The reviewing

court must also give deference to the jury's ability "to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id*. (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

We may not substitute our judgment for that of the jury by reevaluating the weight and credibility of the evidence. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). We defer to the jury's responsibility to fairly resolve any conflicts in the evidence, weigh the evidence, and draw reasonable inferences. *See Hooper*, 214 S.W.3d at 13. The jury alone decides whether to believe eyewitness testimony, and it resolves any conflicts in the evidence. *See id.*; *Young v. State*, 358 S.W.3d 790, 801 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). In conducting a sufficiency review, "[w]e do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure that the jury reached a rational decision." *Young*, 358 S.W.3d at 801.

**B.     Deadly Conduct**

A person commits the offense of felony deadly conduct when that person knowingly discharges a firearm at or in the direction of one or more individuals. TEX. PENAL CODE ANN. § 22.05(b)(1), (e). A person acts knowingly with respect to the nature of his conduct or to circumstances surrounding his conduct when that person is aware of the nature of his conduct or the circumstances that exist. TEX. PENAL CODE ANN. § 6.03(b). The "knowing" element may be inferred from words, acts, or conduct of the accused and from the circumstances under which the act occurred. *See Wheaton v. State*, 129 S.W.3d 267, 273 (Tex. App.—Corpus Christi 2004, no pet.).

## C.    Analysis

Zumm identified Dawson as the man who discharged a firearm at him. Zumm testified he knew Dawson, he recognized Dawson, and he knew the "cart" on which he was riding that day. The arresting officers found shell casings in the vicinity where Zumm indicated Dawson had fired the weapon at him. When the officers asked Dawson about the event, he acknowledged firing the weapon, but indicated he was out looking for his dog and was firing at a rattlesnake. He further acknowledged that Zumm became angry and was scared when Dawson was firing; and, Dawson never told Zumm he was firing at snakes and never mentioned snakes.

Additionally, the jury heard testimony from Zumm, his wife, and from Investigator Sanchez regarding how upset Zumm was following the incident. Although Dawson testified he was not firing "at or in the direction of" Zumm, it is within the jury's sole purview to determine the credibility of the witnesses and to draw reasonable inferences from *all* of the evidence presented before them. See *Adames*, 353 S.W.3d at 860; *Hooper*, 214 S.W.3d at 13.

From this evidence, the jury reasonably could have concluded that Dawson was the person who discharged a firearm, and that it was discharged "at or in the direction of" Zumm. The jury could have also believed Zumm's testimony that Dawson was shooting at or in his direction, and not at a snake. Therefore, because we conclude that the jury reasonably could have found the essential elements of deadly conduct beyond a reasonable doubt, *see* TEX. PENAL CODE ANN. § 22.05(b)(1), this court will not "engage in a second evaluation of the weight and credibility of the evidence." *Young*, 358 S.W.3d at 801. Dawson's sufficiency issue is overruled.

### CONCLUSION

Having overruled each of Dawson's issues on appeal, we affirm the trial court's judgment.

Patricia O. Alvarez, Justice